**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

KOKAK LLC D/B/A PROFESSIONAL
VAULT STORAGE,

    Plaintiff,

  v.            CAUSE NO.: 2:18-CV-177-TLS

AUTO-OWNERS INSURANCE
COMPANY,

    Defendant.

## OPINION AND ORDER

The Plaintiff, Kokak LLC d/b/a Professional Vault Storage, brought a declaratory action

against the Defendant, Auto-Owners Insurance Company, seeking to either compel Defendant's

participation in the mandatory appraisal process or for damages from the Defendant's breach of

contract and bad faith. The Defendant moved for Summary Judgment. For the reasons below, the

Defendant's Motion is DENIED.

## PROCEDURAL BACKGROUND

The Plaintiff filed suit on April 27, 2018 [ECF No. 1]. On February 28, 2019, the

Plaintiff filed a Motion to Compel Appraisal [ECF No. 16], to which the Defendant responded

[ECF No. 17], and the Plaintiff replied [ECF No. 18]. On May 7, 2019, the Court denied the

Motion without prejudice, ruling that the Court should first address the dispositive coverage

issues, specifically whether the suit was time-barred. *See* May 7, 2019 Order, ECF No. 25.

After the conclusion of discovery, the Defendant filed its Motion for Summary Judgment

[ECF No. 45], Defendant's Brief in Support of its Motion for Summary Judgment ("Def.'s Br.")

[ECF No. 46], and its Statement of Material Facts Upon Which There is No Genuine Issue in

Support of Its Motion for Summary Judgment ("Def.'s Stmt.") [ECF No. 45-1] and exhibits [ECF Nos. 45-2–17]. The Plaintiff responded, filing Plaintiff's Response Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Resp.") [ECF No. 48], with its own Statement of Genuine Disputes ("Pl.'s Stmt.") [ECF No. 49] and a Designation of Evidence ("Pl.'s Desig.") identifying exhibits [ECF No. 50–50-3]. The Defendant replied, filing the Defendant's Reply Brief in Support of its Motion for Summary Judgment ("Def.'s Reply") [ECF No. 52].

On the same day the Plaintiff responded to the Summary Judgment Motion, it also filed its first Motion to Strike Exhibits and Purported Undisputed Facts [ECF No. 47]. The Defendant responded [ECF No. 51], and the Plaintiff replied [ECF No. 56].

The Defendant filed two subsequent motions: first, a Motion for Leave to File a Supplemental Designation of Evidence [ECF No. 53], to which the Plaintiff responded [ECF No. 57] and the Defendant replied [ECF No. 63]; and second, its own Motion to Strike Certain Portions of Plaintiff's Designation of Evidence [ECF No. 54] with an associated brief [ECF No. 55], challenging the Plaintiff's Designation, to which again the Plaintiff responded [ECF No. 58] and the Defendant replied [ECF No. 64].

The Plaintiff filed five subsequent motions, to which the Defendant responded, and the Plaintiff replied: a second Motion to Strike challenging the Defendant's reply in support of Summary Judgment [ECF Nos. 59, 67, 73];[1] a Motion to Supplement its own Designation of Evidence [ECF Nos. 61, 65, 71]; a Motion for Leave to File a Sur-Reply to the Motion for Summary Judgment [ECF Nos. 62, 66, 72], which included within the motion the fourteen-page proposed Plaintiff's Sur-Reply in Opposition to the Defendant's Motion for Summary Judgment

---

[1] The Plaintiff's Memorandum in Support of this Motion to Strike is filed at ECF No. 60.

("Pl.'s Sur-Reply"); a third Motion to Strike, challenging the Defendant's replies to its

subsequent Motions [ECF Nos. 68, 75, 77][2]; and finally a Second Motion for Leave to File a Sur-

Reply to Defendant's Reply in Support of Its Motion to Strike the Plaintiff's Evidence (Doc 64),

designating the "Memorandum in Support of [the Plaintiff's] Motion to Strike Portions of [the

Defendant's] Replies (Doc 63 and Doc 64) in Support of [the Defendant's] Motions to Strike

Evidence and Supplement Evidence" [ECF No. 69] as the second Sur-Reply [ECF Nos. 70, 74,

76].

The Court issued an Order granting both Motions to Supplement and Motions for Sur-

Reply and denying all the Motions to Strike without prejudice. *See* Mar. 31, 2021 Op. & Order,

ECF No. 80. As the Court noted in that Order, "it is the function of a court, with or without a

motion to strike, to review carefully both statements of material facts and statements of genuine

issues . . . and to eliminate from consideration any argument, conclusions, and assertions

unsupported by the documented evidence of record offered in support of the statement." Op. &

Order at 2 (quoting *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 596 (N.D. Ind. 2006)

(collecting cases); *accord Potts v. A & A Mfg. Co. Inc.*, No. 2:07-CV-167, 2010 WL 427762, at

*1 (N.D. Ind. Jan. 29, 2010); *see also Vaught v. Quality Corr. Care, LLC*, No. 1:15-CV-346,

2018 WL 1900153, at *2 (N.D. Ind. Apr. 19, 2018) ("Because the Court is able to distinguish

which exhibits, affidavits, statements, and commentary may properly be considered when

deciding whether summary judgment is appropriate, the Court declines to strike these statements

from the Plaintiff's Memorandum.")). In accordance with this function, any issues raised in the

various ancillary Motions necessary to ruling on the Summary Judgment Motion will be

addressed in this Opinion and Order. As the Court also noted in the March 31, 2021, Opinion and

---

[2] The Plaintiff's Memorandum in Support of this Motion to Strike is filed at ECF No. 69.

Order, the Court has reviewed all the parties' extensive briefing on the various issues. To the extent an argument was raised by the parties but is not addressed in this Opinion and Order,[3] it was not necessary to reach the Court's conclusion on summary judgment.

### SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000),

---

[3] For example, the Defendant raised as a fact that it had not engaged in bad faith, *see, e.g.*, Def.'s Stmt. at ¶ H.2; the Plaintiff properly moved to strike the fact as a legal conclusion, *see* Pl.'s Mot. to Strike Exs. and Purported Undisputed Facts, ECF No. 47. The Court can evaluate whether such a statement is a legal conclusion without addressing the extensive briefing on the issue, and did so.

and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## FACTUAL BACKGROUND

### A.    Facts for Purposes of Summary Judgment[4]

The Plaintiff is a limited liability company, owned by Joshua Milton and Frederick Leaf. *See* Suppl. Juris. Statement ¶ 4, ECF No. 33. The Plaintiff owns a commercial storage warehouse in Portage, Indiana. See Def.'s Ex. A, Compl. ¶ 13; Pl.'s Desig. ¶ 6. In approximately 1996, the original steel roof was covered with plywood and 3-tab asphalt shingles. *See* Def.'s Ex. Ex. H-1 at 27; Pl.'s Desig. ¶ 30. The warehouse's roof has a pitch of less than 2:12. *See* Def.'s Exs. H-1 at 3,[5] I-4 at 3; Pl.'s Desig. ¶¶ 30–31. In February, March, and April 2016, strong winds gusted through the area. *See* Def.'s Ex. M-2 at 10; Pl. Desig. ¶ 33.

The Defendant issued a commercial property insurance policy covering the warehouse. *See* Def.'s Ex. A, Compl. ¶ 14; Pl.'s Desig. ¶ 6. On February 29, 2016, an underwriting survey was performed. *See* Def.'s Ex. H-1; Pl.'s Desig. ¶ 30. The survey notes, "About 1.5 weeks ago wind damaged some flashing and blew shingles off the north side of the building." *Id.* at 2; *see also* 27. The surveyor reported, "I was only able to view the roof with a camera pole so the entire

---

[4] While the Defendant filed a Statement of Material Facts [ECF No. 45-1], its Brief [ECF No. 46] contains additional facts not found in its Statement of Material Facts. Similarly, while the Plaintiff filed a Statement of Genuine Disputes [ECF No. 49], some of its numbered paragraphs are not supported by record citations, some are not disputed, and its Response Brief contains additional facts as well. Both parties heavily relied on affidavits to present their evidence; many paragraphs of several of the affidavits are the primary subject of several of the Motions to Strike. However, the Plaintiff largely accepted the exhibits filed by the Defendant. *See generally* Pl.'s Desig., ECF No. 50. Given this presentation of the facts by the parties, along with the four Motions to Strike, the Court has cited deposition or documentary evidence wherever possible, and the Court has often cited both the Defendant's exhibit and the paragraph from the Plaintiff's Designation accepting that exhibit. The facts as the Court must accept them for Summary Judgment purposes are presented first; disputes of material fact are addressed subsequently.
[5] Technically, the underwriting survey cited here provides the roof pitch as "100% Low (2:12 to 6:12 pitch)." Def.'s Ex. H-1 at 3. However, the later report states "Per our follow-up site visit on September 28, 2017 we confirmed the roof pitch to be less than 2:12." Def.'s Ex. I-4 at 3. Additionally, the pitch of the roof is not a fact the Plaintiff appears to dispute, so the Court accepts the roof pitch as less than 2:12.

roof could not be adequately assessed but about 5% of the shingles are missing on the north side of the roof." *Id.* The survey also recommends replacing the roof immediately. *Id.* The survey was not provided to the Plaintiff during 2016. *See* Pl.'s Ex. 1 (Leaf Aff.) ¶¶ 5, 10.[6]

On May 1 or 2, 2016, Leaf, on behalf of the Plaintiff, reported damage to the roof to a woman at Anton Insurance Agency, his insurance agent; Leaf specified that he did not know precisely when the damage had occurred. *See* Def.'s Ex. B 15:15–21, 40:14–16; Pl.'s Resp. to Mot. to Strike Ex. A-1 41:22–42:4, ECF No. 58-1; Pl.'s Desig. ¶ 7.[7] After May 1, 2016, temporary repairs were made to the roof. *See* Pl.'s Ex. 1 (Leaf Aff.) ¶ 7; Pl.'s Ex. 2 (Milton Aff.) ¶¶ 9–12.[8]

On June 6, 2016, the Defendant investigated the loss reported by Leaf and found wind damage. *See* Def.'s Ex. K-2; Pl.'s Desig. ¶ 32; Pl.'s Compl. ¶ 20. On June 14, 2016, the Defendant sent an estimate to the Plaintiff and issued the Plaintiff an actual cash value advance ("ACV") of $5,572.80, for damage to the warehouse. *See* Def.'s Ex. G-4 at 3 and Ex. G-5; Pl.'s Desig. ¶¶ 12–13. On August 18, 2016, the Plaintiff hired a public adjuster, Wade Tutt. *See* Pl.'s Ex. 1 ¶ 9; *see also* Pl.'s Ex. 3 ¶ 2. On October 5, 2016, Tutt sent a letter rebutting the Defendant's estimate and providing one for the Plaintiff. *See* Def.'s Ex. G-6; Pl.'s Desig. ¶ 14.

---

[6] The Defendant challenges this statement in Leaf's affidavit, identifying a typographical error and citing the January 11, 2017, report's reference to the underwriting inspection as demonstrating that Leaf knew of the report by some time in 2017. *See* Def.'s Mot. to Strike 9, ECF No. 55. Neither of these challenges negate the fact that the Defendant did not provide a copy of the report to the Plaintiff during 2016.

[7] When, precisely, the Plaintiff knew of the damage to the roof is the primary disputed issue of material fact; it is addressed below.

[8] The Defendant has moved to strike paragraphs nine through eleven of Milton's affidavit, as "legal argument" and "lack[ing] any supporting evidence," including expert testimony. However, Milton and Leaf, as the owners of the Plaintiff, would have knowledge of the repairs, and the Defendant does not cite any evidence contradicting that the repairs were made or any expert testimony of its own that the repairs were insufficient. Thus, for purposes of summary judgment, the Plaintiff made adequate repairs. *See also* Def.'s Ex. G-14 at 1 (noting "[t]emporary roof covering was placed over each of the damaged areas").

On December 30, 2016, Tutt and a representative of Structurepoint conducted an investigation into damage on the roof; Structurepoint issued a report on January 11, 2017. *See* Def.'s Ex. G-7; Pl.'s Desig. ¶ 15. On March 3, 2017, the Defendant provided a new estimate, and on March 29, 2017, the Defendant paid an additional $2,535.06. *See* Def.'s Exs. G-8 and G-9; Pl.'s Desig. ¶¶ 16–17. On April 6, 2017, Tutt sent an email on behalf of the Plaintiff asserting a demand for appraisal, as the Plaintiff still disputed the amount covered under the Policy. *See* Def.'s Ex. G-10; Pl.'s Desig. ¶ 18.

On June 7, 2017, the Defendant responded by letter. *See* Def.'s Ex. G-11; Pl.'s Desig. ¶ 19. The letter says, "We are continuing the investigation and handling of your claim under a full reservation of rights, and are requesting additional information to process your claim. At this time we are requesting you submit a signed and notarized proof of loss." *Id.* at 1. On July 12, 2017, the Plaintiff provided a notarized Proof of Loss. Def.'s Ex. G-12; Pl.'s Desig. ¶ 20. The Proof of Loss Statement identifies February 24, 2016, as the date the loss occurred. *Id.* at 14.[9] On August 22, 2017, more than thirty days later, the Defendant sent a Reservation of Rights letter. *See* Def.'s Ex. G-13; Pl.'s Desig. ¶ 21.

On September 28, 2017, Structurepoint conducted another inspection of the warehouse. *See* Def.'s Ex. G-14.[10] On October 4, 2017, the second Structurepoint engineer issued a report, recommending the shingles and plywood be removed and replaced with an alternate roof system.

---

[9] The Plaintiff, through Leaf, in both deposition and affidavit testimony, has articulated that Leaf was told by claims handler Aaron Weber that the Defendant would not accept a Proof of Loss with a date of loss of May 1, 2016. *See* Pl.'s Ex. 1 (Leaf Aff.) ¶ 10; Def.'s Ex. B 37:7–18. The Plaintiff, however, does not appear to contest that the warehouse's roof likely suffered some damage on approximately February 24, 2016; instead, Leaf's testimony regarding the date on the Proof of Loss is consistent with his other testimony, and, at the summary judgment stage, establishes that the Plaintiff did not know precisely when the full loss occurred in 2016.

[10] While this is not one of the Defendant's exhibits accepted in the Plaintiff's Designation, the same report is also attached to the Coverage Explanation letter, which is accepted by the Plaintiff.

*Id.* On October 6, 2017, the Defendant sent an additional Coverage Explanation letter to the Plaintiff. *See* Def.'s Ex. G-15; Pl.'s Desig. ¶ 22. The letter explains that the roof is below a 2:12 pitch and, therefore, the asphalt roofing structure cannot be repaired and must be replaced to meet the current building code for the City of Portage. *Id.* at 1. The letter also details that, while the Ordinance and Law Coverage endorsement to the Policy applies, "[i]n order to repair, reconstruct, or remodel your roofing system to keep it in code, it will require you reconstruct or remodel the undamaged portions of the building." *Id.* at 4. It adds that, "in order for [the Ordinance and Law Coverage] to be paid, the property must actually be repaired, replaced." *Id.*

On November 19, 2017, Tutt sent a response to the October 6, 2017 letter with a new estimate of the replacement. *See* Def.'s Ex. G-16; Pl.'s Desig. ¶ 23. The Defendant responded by letter and with an additional estimate on January 19, 2018. *See* Def.'s Exs. G-17 and G-18; Pl.'s Desig. ¶¶ 25, 26. The Defendant also paid an additional $13,554.85 on the claim. *See* Def.'s Ex. G-17; Pl.'s Desig. ¶ 25.

On April 20, 2018, the Defendant responded to a second request for appraisal by the Plaintiff that had been sent on March 27, 2018; specifically, the letter explains that "the concern presented is regarding the minimum requirement referenced in Ordinance or Law Coverage . . . and is not related to the value of the loss. This dispute would be related to coverage." *See* Def.'s Ex. G-20; Pl.'s Desig. ¶ 27. On April 27, 2018, the Plaintiff filed the Complaint in this case. *See* Compl., ECF No. 1.

**B.    Disputed Facts**

*1.    When the Plaintiff Knew About the Damage to the Roof*

The Defendant argues the Plaintiff knew of damage to the roof in February 2016. In support, the Defendant relies on several pieces of evidence. The Defendant first identifies the

underwriting survey's note that "[a]bout 1.5 weeks ago wind damaged some flashing and blew shingles of the north side of the building." *See* Def.'s Ex. H-1 at 2. According to the report and Milton's own testimony, Milton as one of the two co-owners of the Plaintiff, was present for the survey. *Id.*; *see also* Def.'s Ex. C 70:5–14. Milton also testified that, while he did not recall making the comment in the underwriting survey note, he did not deny making it either. *See* Def.'s Ex. C at 71:12–22. Additionally, Milton testified, while looking at photographs connected to the underwriting report, that "I must have known that there was some shingles at the bottom." Def.'s Suppl. Ex. P 75:16–17, ECF No. 53-1, p. 17. However, neither the survey nor Milton's testimony confirms that Milton knew of the damage in February 2016. For example, the survey also includes a note that the roof could only be viewed with a camera pole; and Milton testified that "I didn't know it was that bad on that day, to be honest." Def.'s Ex. H-1 at 3; Def.'s Suppl. Ex. P at 75:8–9.

For the first time in its reply,[11] the Defendant cited additional evidence, including Milton's deposition testimony that he was on the roof before February 29, 2016. *See* Def.'s Suppl. Ex. P 75:23–76:9. However, Milton's testimony about being on the roof does not present any evidence that he knew of damage in late February 2016: the roof is large[12] and Milton does not testify to when he was on the roof. Also for the first time on reply, the Defendant cited an "invoice for 'emergency services' for damaged shingles," with a "date entered" of December 22, 2015, as evidence that the Plaintiff knew of the roof damage before February 2016. *See* Def.'s

---

[11] As the Plaintiff notes, the Defendant should not raise new evidence for the first time in its reply. *See Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015) (holding that a district court dismissing a case on the basis of evidence and theories raised for the first time in reply without granting leave for a sur-reply had deprived the plaintiff of due process). However, as the evidence does not affect the outcome on summary judgment and the Court granted the Plaintiff's Motion for Leave to File a Sur-Reply and considered the sur-reply, the evidence need not be rejected on that basis.

[12] The roof has a surface area of at least 17,550 square feet. *See* Def.'s Ex. G-15 at 9.

Reply 5 n.1, ECF No. 52 (citing Def.'s Ex. G-12 at 11–12, and Def.'s Suppl. Ex. P 86:17–87:3). However, Milton testified that the December 22, 2015 date is "completely irrelevant to anything" and is not necessarily the date the document was created. *See* Def.'s Suppl. Ex. P 86:21–87:9. Thus, the Defendant's evidence does not establish that the Plaintiff knew about the damage in February 2016.

In contrast, Leaf consistently testified on behalf of the Plaintiff that, after finding a shingle on the ground on approximately May 1 or 2, 2016, he called his insurance agent to report the claim. *See* Def.'s Ex. B 40:10–25; Pl.'s Resp. to Mot. to Strike Ex. A-1 41:1–42:25, ECF No. 58-1. The Plaintiff thus identifies May 1 or 2, 2016, as the date on which the Plaintiff learned of the damage to the roof and has presented enough evidence to genuinely dispute the Defendant's contrary presentation. For purposes of summary judgment, drawing all reasonable inferences in favor of the nonmoving party, the Court accepts May 1 or 2, 2016, as the date on which the Plaintiff first realized there was damage to the roof worth reporting.

2.   *When the Plaintiff Reported the Damage*

As detailed above, Leaf testified that he reported the damage to his insurance agent immediately after discovering it, on May 1 or 2, 2016. *See* Def.'s Ex. B 40:10–25; Pl.'s Resp. to Mot. to Strike Ex. A-1 41:1–42:25, ECF No. 58-1. In contrast, the Defendant presents June 2, 2016, as the date on which Leaf reported the damage, citing Leaf's deposition testimony. *See* Def.'s Br. at 4; Def.'s Stmt. ¶ B.2; *see also* Def.'s Ex. B at 50:22–51:5. However, that citation covers only the Defendant's counsel asking Leaf, "If [claims adjuster] Don Detering's notes reflect that he spoke to you on or about June 2 or 3, 2016, and that you told him that you believe the loss occurred on or about May 1 of 2016, but you weren't exactly sure, would that be consistent with what you knew at the time," and Leaf replying, "yes." *Id.* The Defendant also

relies on Milton's testimony to contradict Leaf's. *See* Def.'s Br. in Support of Mot. to Strike 6–7,

ECF No. 55 (citing Milton's testimony, at Def.'s Ex. C 57:8–58:9). At Milton's deposition, the

Defendant's counsel and Milton discussed a voicemail that was apparently left "in the claims

department," on June 2, 2016, at 8:29 p.m. *See* Def.'s Br. Ex. C 57:17–58:5. In that testimony,

Milton says, "it would have been for June 2," as the date of Leaf's report of the claim, but Milton

gave that testimony relying on the Defendant's counsel's representations regarding the date of

the voicemail as June 2 even though Milton had previously identified the date of Leaf's report as

May 2.[13] Finally, even if Leaf did speak to Don Detering on June 2nd or 3rd, such a conversation

does not preclude Leaf from having also reported the damage to his insurance agent on May 1st

or 2nd; the Defendant has not articulated why such a report would not qualify as notifying the

Defendant.

   Leaf's testimony is contradicted by an email presented by the Defendant, which is from

the head of the insurance agency the Plaintiff used. *See* Def.'s Ex. D to its Mot. to Strike, ECF

No. 55-4. The email is dated June 15, 2017, more than a year after the May or June 2016 time

frame at issue, is addressed again to Don Detering, and states: "the claim was not filed through

our office; rather direct to AO." *Id.* However, even assuming the email is properly considered on

---

[13] The Defendant argues that Milton, and not Leaf, was the Fed. R. Civ. P. 30(b)(6) deponent on this subject; and that therefore, Leaf's testimony should be stricken, as Milton should have been prepared to testify as to the Plaintiff's reporting himself. The Court declines to issue that sanction in this case. Additionally, neither the voicemail nor testimonial evidence from Don Detering is included in the summary judgment record. The only evidence supporting the June 2nd date is the Defendant's counsel's presentation of the voicemail at Leaf and Milton's depositions and an affidavit from the claims handler, Aaron Weber. *See* Def.'s Ex. G, Weber Aff. ¶ 12 ("On June 1, 2016 after hours, [Leaf] reported to adjuster Don Detering that the [warehouse] sustained damage as a result of a wind event on May 1, 2016 . . . ."). But Weber or Defendant's counsel presenting what was said to Don Detering by Leaf is hearsay, and thus would not be admissible at trial and is not properly considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(2) and (4). The Defendant argues that the hearsay exception, statement by a party opponent, applies to Aaron Weber's affidavit. *See* Def.'s Mem. in Resp. to [Pl.'s] Mot. to Strike Exhibits and Purported Undisputed Facts 2–4, ECF No. 51. However, Aaron Weber is presenting Don Detering's statements; Don Detering is not a party opponent, and thus Weber's representations about what was said to Detering are not covered by that exception.

summary judgment, at most it creates an issue of fact that cannot be resolved at this stage. For purposes of summary judgment, Leaf reported the damage on May 1 or 2, 2016, as soon as he learned of it, to his insurance agent.

3.     *Whether the Warehouse's Roof Was Code-Compliant before the Damage*

The Defendant presents, as a fact, that "[t]he asphalt shingle roofing system of the [warehouse] did not comply with City of Portage Building Code prior to the loss." Def.'s Stmt. at ¶ G.11. However, that conclusion requires both factual and legal analysis. The Court addresses the necessary factual evidence here and the conclusion in the analysis section below.

The facts do not present a clear representation regarding the roof's compliance with the relevant code before the loss. The Defendant cites[14] a discussion in Structurepoint's Supplemental Report from April 1, 2019. *See* Def.'s Ex. I-4.[15] In the report, the engineer states:

> It is our understanding the building was constructed in 1986, and the roofing system comprised of plywood decking and asphalt shingles was installed over the original metal panel system in 1996. Based on our conversation with the City of Portage building department, the code adopted by the city was the 1991 Uniform Building Code (UBC). Our review of the 1991 UBC per "Table No. 32-B-1 – Asphalt Shingle Application", the code did not permit asphalt shingles to be installed on roof slopes less than 2:12. Per our follow-up site visit on September 28, 2017 we confirmed the roof pitch to be less than 2:12. Based on these findings the roof system, as installed, does not meet current code standards.

*Id.* at 3. However, the report does not include the code itself, and the engineer does not present himself as an expert in building code compliance. Nor does the report address whether the detail that the asphalt shingles were installed over an original metal roof makes a difference to the analysis.

---

[14] The Defendant also cites several paragraphs of Aaron Weber's Affidavit, which state this conclusion. *See, e.g.*, Def.'s Ex. G ¶¶ 34, 39. However, Aaron Weber is not presented as an expert in building codes, and the paragraphs do not cite documents that support that conclusion.

[15] The same report is presented at Def.'s Ex. G-21, which the Defendant sometimes cites in support of its position.

Elsewhere in the summary judgment record, the Building Commissioner for the City of Portage, in an email to Milton in June 2017, stated that "[b]y code, asphalt shingles cannot be installed on roof pitches less than 2/12. Therefore a permit cannot be issued for repair of the damages. The entire roof must be replaced with an acceptable covering." *See* Def.'s Ex. G-12 at 4 (email from Doug Sweeney).[16] While this email clarifies that asphalt shingles cannot be installed over the damaged portions, it does not by itself establish that the roof was not code-compliant at the time of the damage in 2016.

In addition to these citations, the Defendant highlights that the Plaintiff has not produced any "building and construction permits, plans, specifications, invoices or other documentation regarding the application of the asphalt shingle roof in 1996." Def.'s Suppl. Ex. N ¶ 14, ECF No. 53-1, p. 5. The Plaintiff argues that an inability to locate a permit does not mean one did not exist at some point in time. *See, e.g.*, Pl.'s Mem. at 13, ECF No. 69. However, summary judgment is the "put up or shut up" moment in litigation, and the non-moving party must provide not only evidence but evidence upon which a reasonable jury could rely. *Goodman*, 621 F.3d at 654. For purposes of summary judgment, the Plaintiff does not have permits that establish the roof's compliance with code when the roof was installed in 1996.

## C.     Relevant Policy Provisions

The parties agree that the policy attached to the Defendant's Motion for Summary Judgment as Exhibit F is the relevant Policy. *See* Def.'s Ex. F; Pl.'s Desig. ¶ 9.

In the "Building and Personal Property Coverage Form," under "E. Loss Conditions," the Policy provides:

---

[16] The same email is presented in Def.'s Ex. L at 30, which the Defendant sometimes cites in support of its position.

3.  Duties In The Event Of Loss Or Damage
    a.  You must see that the following are done in the event of loss or damage to Covered Property:

                                    * * *

    (2) Give us prompt notice of the loss or damage.  Include a description of the property involved.
    (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.
    (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.  Also, if feasible, set the damaged property aside and in the best possible order for examination.

                                    * * *

    (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request. We will supply you with the necessary forms.

Def.'s Ex. F. at 69. Under "4. Loss Payment," the Policy indicates "[w]e will give notice of our intentions within 30 days after we receive the sworn proof of loss." *Id.* at 70.

Also in the "Building and Personal Property Coverage Form," under "G. Optional Coverages," the Policy provides:

3.  Replacement Cost
    a.  Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

                                    * * *

    d.  We will not pay on a replacement cost basis for any loss or damage:
        (1) Until the lost or damaged property is actually repaired or replaced; and
        (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

*Id.* at 73.

In the "Ordinance or Law Coverage" endorsement, the Policy provides:

E.  Coverages

                                    * * *

3.  Coverage C - Increased Cost Of Construction Coverage
    a.  With respect to a covered building that has sustained covered direct physical damage, we will pay the increased cost to:

     (1) Repair or reconstruct damaged portions of that building; and/or
     (2) Reconstruct or remodel undamaged portions of that building, whether
        or not demolition is required
        when the increased cost is a consequence of enforcement of the
        minimum requirements of the ordinance or law.
    However:

* * *

     (2) We will not pay for the increased cost of construction if the building is
        not repaired, reconstructed or remodeled.

* * *

F.  Loss Payment

* * *

   4.  Loss payment under Coverage C - Increased Cost of Construction
      Coverage will be determined as follows:
      a.  We will not pay under Coverage C:
         (1) Until the property is actually repaired or replaced, at the same or
            another premises; and
         (2) Unless the repairs or replacement are made as soon as reasonably
            possible after the loss or damage, not to exceed two years.  We
            may extend this period in writing during the two years.

* * *

H.  Under [the Ordinance and Law Coverage] endorsement we will not pay for
    loss due to any ordinance or law that:
    (1) You were required to comply with before the loss, even if the building was
       undamaged; and
    (2) You failed to comply with.

*Id.* at 94–95.

For the "Commercial Property Conditions" endorsement, the Policy provides:

A.  CONCEALMENT, MISREPRESENTATION OR FRAUD
    This Coverage Part is void in any case of fraud by you as it relates to this Coverage
    Part at any time.  It is also void if you or any other insured, at any time, intentionally
    conceal or misrepresent a material fact concerning:
    1.  This Coverage Part;
    2.  The Covered Property;
    3.  Your interest in the Covered Property; or
    4.  A claim under this Coverage Part.

* * *

D.  LEGAL ACTION AGAINST US
    No one may bring a legal action against us under this Coverage Part unless:
    1.  There has been full compliance with all of the terms of this Coverage Part; and
    2.  The action is brought within 2 years after the date on which the direct physical
       loss or damage occurred.

*Id.* at 96.

15

## ANALYSIS

Indiana law applies.[17] *See R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 941

(7th Cir. 2020) ("[I]n this case we apply the substantive law of Indiana to the questions of

contract formation and interpretation." (citing *India Breweries, Inc. v. Miller Brewing Co.*, 612

F.3d 651, 658 (7th Cir. 2010))). Under Indiana law, "[a] contract for insurance is subject to the

same rules of interpretation as are other contracts. If the language in the insurance policy is clear

and unambiguous, then it should be given its plain and ordinary meaning, but if the language is

ambiguous, the insurance contract should be strictly construed against the insurance company."

*Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006) (internal citations and

quotations omitted).

The Plaintiff raises three claims in its Complaint: (1) a declaratory action seeking to

compel the Defendant to engage in the appraisal process as outlined in the Policy, (2) a breach of

contract claim seeking damages, as the Plaintiff alleges the Defendant has not paid the full

amount owed under the Policy, and (3) a claim of bad faith against the Defendant. *See* Compl. 4,

6–7. The Defendant argues that summary judgment is warranted for eight reasons: (1) the

Plaintiff failed to timely bring suit; (2) the Plaintiff failed to timely notify the Defendant of the

loss; (3) the Plaintiff failed to protect the warehouse from further damage or make timely

temporary repairs, which (4) precludes coverage for damages resulting from that failure; (5) the

Plaintiff is not entitled to Replacement Cost Coverage because the Plaintiff did not repair the

roof within two years; (6) the Policy does not cover normal wear and tear and deterioration; (7)

the Ordinance or Law Coverage provision excludes coverage because the warehouse was not in

---

[17] Neither party has argued any other law applies; when the parties do not raise the issue, the Court
applies the substantive law of the forum state. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th
Cir. 2009) (citing *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)).

compliance with the City of Portage Building Code before the damage; and finally, (8) the bad faith claim cannot proceed to trial because the Defendant had a reasonable basis upon which to deny coverage. *See* Def.'s Br. at 1–2, ECF No. 46.

1.     *The Timeliness of the Plaintiff's Suit*

The Policy has a two-year limit on bringing suit against the Defendant, calculated from the date on which the direct physical loss or damage occurred. *See* Ex. F. at 96. The facts establish that some damage occurred around late February 2016; and in any event, all the damage the parties address had occurred by May 1 or 2, 2016. The Plaintiff filed suit on April 27, 2018. *See* Compl., ECF No. 1. "Indiana courts have regularly held that unless a contractual provision contravenes a statute or public policy, actions . . . that are brought after the expiration of the limitation period provision will be barred;" and "[f]ailure to discover a loss within the time provided under the contract for bringing a claim is immaterial." *Popham v. Keystone RV Co.*, No. 3:15-CV-197-TLS, 2016 WL 4993393, at *5 (N.D. Ind. Sept. 19, 2016) (internal citations and quotations omitted) (collecting cases). Thus, unless the Defendant has waived reliance on the limitations period, the Plaintiff's suit is time-barred.

Applicable case law provides that "whether an insurer has waived reliance on a limitations provision is usually a question of fact." *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 381 (Ind. Ct. App. 2004). In *Dunaway*, the Indiana Court of Appeals reviewed how several cases addressed whether a defendant had waived reliance on a limitations provision, including *Wingenroth v. American States Ins. Co.*, 455 N.E.2d 968, 968–69 (Ind. Ct. App. 1983), and *Auto-Owners Ins. Co. v. Cox*, 731 N.E.2d 465, 468 (Ind. Ct. App. 2000). In both *Wingenroth* and *Cox*, the insurer had paid some amount on the claim and continued to negotiate with the insured; in both of those cases, the Indiana Court of Appeals determined summary judgment was not

17

appropriate on the issue of waiver. The facts in *Dunaway* led to the same conclusion: Allstate

had allowed the Dunaways to file their proof of loss form late; had failed to comply with its

requirement to notify the Dunaways of its decision within thirty days of receiving the form; and

had sent a confusing letter. *Dunaway*, 813 N.E.2d at 383. The court concluded that,

notwithstanding Allstate's repeated statement that it was not waiving any rights under the policy,

"Allstate's actions, which are significant in determining implied waiver, were not entirely

consistent with other time limitations set forth in the policy." *Id.* at 384; *cf. Summers v. Auto–

Owners Ins. Co.*, 719 N.E.2d 412, 414–15 (Ind. Ct. App. 1999) (granting summary judgment for

the insurer despite the insured raising waiver, where the insured's actions—but only the

insured's actions—delayed the claim beyond the limitations period).

Here, the Defendant's actions also create a factual issue in determining whether it waived

reliance. The Defendant did not "give notice of its intentions" within thirty days of receiving the

Proof of Loss, as the Policy requires,[18] and paid out on an increased estimate as late as January

2018—after engaging in a protracted investigation that included more than one engineering

report. Based on the relevant case law, the fact of waiver is disputed and cannot be determined

on summary judgment.

The Defendant argues in its reply[19] that the Plaintiff cannot rely on the equitable remedy

of waiver because the Plaintiff violated the "Concealment, Fraud and Misrepresentation"

---

[18] The Defendant cites an August 3, 2017, email from Don Detering to Tutt as contrary to this conclusion.
*See* Def.'s Reply at 14 (citing Pl.'s Resp. at 10, which cites Pl.'s Ex. 3, pp. 9–10). However, the email
only states: "The [Proof of Loss] was received and we are in process of review. We are following up with
the engineering firm for additional information." Pl.'s Ex. 3 at "Tutt 009", ECF No. 50-3 p. 18. On its
face, the Policy requires "notice of [the Defendant's] intentions," which the email does not provide; the
reservation of rights letter, which informs the Plaintiff the Defendant intends to continue investigating,
did not come until August 22, 2017, more than thirty days after receipt of the Proof of Loss.

[19] The Plaintiff has moved to strike this argument on the grounds that it is raised for the first time in reply.
*See* Pl.'s Mem. in Support of its [second] Motion to Strike 1–3, ECF No. 60. The Plaintiff has also moved
for leave to file a sur-reply to address the new argument. *See* Mot. for Leave to File a Sur-Reply, ECF No.

condition of the Policy. *See* Def.'s Reply at 3–4. Specifically, the Defendant contends that the Plaintiff made two material misrepresentations to the Defendant: (i) the date of the damage, and (ii) that the building was code-compliant before the loss.

The Defendant has not established that the Plaintiff misrepresented either fact. First, as discussed, Leaf has consistently testified that while he reported the damage on May 1 or 2, 2016, after discovering a shingle on the ground, he has never been certain when the damage actually occurred. Nothing in the record shows Leaf actually saying the damage occurred on May 1st or 2nd when he reported it; only that May 1st or 2nd is when he discovered it.[20] Second, while Tutt says in an early letter that the warehouse was code-compliant, as discussed above in the factual background and below in Section 7, the Defendant has not established that this was untrue, at least for purposes of summary judgment. As a result, the Court cannot conclude the Plaintiff has made a misrepresentation such that the Concealment, Fraud and Misrepresentation provision bars the Plaintiff's suit.

---

62. Generally, "replies should be confined to the issues raised in the opening motion or brief;" otherwise, "it is unfair . . . [to] the non-moving party" because of a lack of opportunity to respond. *See Boyer v. Canterbury Sch., Inc.*, No. 1:04-CV-367, 2005 WL 2370232, at *3 (N.D. Ind. Sept. 27, 2005) (internal citations omitted); *see also Praigrod v. St. Mary's Med. Ctr.*, No. 3:05-CV-166, 2007 WL 178627, at *3 (S.D. Ind. Jan. 19, 2007) ("[T]he court gathers that the Seventh Circuit endorses a requirement that arguments be raised in an opening brief as opposed to a reply brief on summary judgment." (citing *Cleveland v. Porca Co.*, 38 F.3d 289, 297 (7th Cir. 1994)))). However, the unfairness can be "remedied by allowing a surreply." *Boyer*, 2005 WL 2370232 *3. The Court has cured any unfairness by granting the Plaintiff's two requests to file a sur-reply. *See* Mar. 31, 2021 Op. & Order, ECF No. 80.

[20] On the other hand, the Plaintiff repeatedly argues that the Defendant misrepresented the date of loss by using 5/1/2016 in multiple pieces of correspondence. *See, e.g.*, Pl.'s Stmt. ¶ 2; Pl.'s Br. at 23 ("If February 24, 2016 is the correct date, [the Defendant] made a material misrepresentation of fact to its insureds . . . every time it sent them a letter."). To say the Defendant misrepresented the date is also inaccurate. It appears both parties relied on Leaf's approximate date throughout the investigation process. The Plaintiff has presented no evidence to suggest the Defendant did so in an attempt to lull the Plaintiff into delaying filing suit.

Thus, while the Plaintiff did not bring suit within two years of the damage to the warehouse, a genuine issue of material fact exists regarding the Defendant's implied waiver, which precludes summary judgment.

2.      *The Timeliness of the Plaintiff's Notification to the Defendant*[21]

The Defendant argues that the Plaintiff failed to timely notify the Defendant of the loss. The Policy provides that the Plaintiff was required "as soon as possible" to "give . . . prompt notice of the loss or damage," giving a description of "how, when and where the loss or damage occurred." Def.'s Ex. F at 69. Under Indiana law, "a notice requirement is material, and of the essence of the contract." *Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270, 277 (Ind. Ct. App. 1999) (citation omitted). "The duty to notify an insurance company of potential liability is a condition precedent to the company's liability to its insured." *Id.* (citation omitted). And, "[w]hen the facts of the case are not in dispute, what constitutes 'reasonable notice' is a question of law for the Court to decide." *Id.* at 278 (citation omitted). But as set forth above, the facts of this case are in dispute: the Plaintiff maintains that it only learned of the damage May 1 or 2, 2016, and reported it immediately; the Defendant maintains that the

---

[21] Sometimes, the Defendant appears to frame this argument as relating to the date the Plaintiff submitted the Proof of Loss. *See, e.g.*, Def.'s Br. at 7 ("[The Plaintiff] did not submit a Sworn Proof of Loss within the sixty (60) day time period required by the Policy."). However, the Policy is very clear that the Proof of Loss only needs to be submitted sixty days after it is requested. *See* Def.'s Ex. F at 69 (requiring that the insured "[s]end us a signed sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms."). It is also undisputed that the Defendant did not request the Proof of Loss until June 7, 2017. *See* Def.'s Ex. G-11. The Plaintiff sent the Proof of Loss on July 12, 2017. *See* Def.'s Ex. G-12. Thus, the Plaintiff responded within the sixty-day window. Additionally, the Defendant appears to have abandoned this argument. *See* Def.'s Mem. in Resp. to [the Plaintiff's] Mot. to Strike Exs. and Purported Undisputed Facts 7 ("[The Defendant] is not relying on [the Plaintiff's] failure to timely provide the Proof of Loss as a coverage defense.").

Plaintiff knew of the damage in late February 2016 and did not report the damage until June 2, 2016. Thus, summary judgment cannot be granted on this basis.[22]

3.      *The Plaintiff's Repairs*

Next, the Defendant argues that the Plaintiff failed to protect the warehouse from further damage or make timely temporary repairs, which would bar coverage for damages resulting from that failure. The Defendant relies on *Shifrin v. Liberty Mut. Ins.*, 991 F. Supp. 2d 1022, 1035 (S.D. Ind. 2014), which held that the Shifrins, by refusing to repair the roof, had breached the "Duties After Loss" provision of the relevant policy. *Id.* at 1035–36. The court explained:

> The Shifrins never took the necessary action to replace the roof, instead arguing that the tarps were adequate to prevent further damage and that it would be a waste to replace shingles because the decking needed to be replaced first. Yet the Shifrins acknowledge that additional water damage has occurred by stating "[d]uring the rainy spring season additional damage was largely irrelevant, same wet ceiling, same wet insulation fell on a pre-damaged floor."

*Id.* at 1035 (internal citation omitted). As the "Suit[s] Against Us" provision required complying with the "Duties After Loss," including preventing further damage, summary judgment was granted against the Shifrins. *Id*. at 1035–36.

The same facts are not presented here. The Defendant's argument that the repairs were not timely is predicated on their assertion that the Plaintiff knew of the damage in late February 2016 and took no action to repair or preserve the roof until early June 2016. However, as detailed above for purposes of summary judgment, the Plaintiff made repairs as soon as it knew of the damage, and so the timeliness of the repairs is not at issue. Additionally, unlike the Shifrins, the

---

[22] Even if the Defendant's facts were established, the Defendant has not sufficiently established that, as a matter of *Indiana* law, the Plaintiff's notice was unreasonable. The Defendant's comparable cases are from other jurisdictions and appear to apply the law of those states. *See, e.g.*, Def.'s Br. at 15 (citing *Myers v. Cigna Prop. & Cas. Ins. Co.*, 953 F. Supp. 551, 556–57 (S.D.N.Y. 1997) (applying New York law)).

Plaintiffs made repairs that preserved the warehouse from further damage. Thus, summary judgment cannot be granted on this basis.

4.    *Damages Resulting from the Plaintiff's Failure to Protect the Warehouse*

The Policy excludes damage resulting from the Plaintiff's failure to protect the warehouse; however, as discussed above, for purposes of summary judgment the Plaintiff has completed repairs that sufficiently protected the warehouse from further damage.

5.    *Replacement Cost Coverage and Replacement Costs Under the Ordinance and Law Provision*

The Defendant argues that the Plaintiff is not entitled to Replacement Cost Coverage because the Plaintiff did not repair the roof within two years. The Policy has two provisions relevant to replacement costs. First, for Replacement Costs generally, the Policy provides that the Defendant will not pay on a replacement cost basis for any loss or damage "until the lost or damaged property is actually repaired or replaced" and "unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." Def.'s Ex. F at 79.

Similarly, the Ordinance and Law Coverage section provides that, with respect to the increased cost of construction coverage, "[w]e will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled" and that the relevant loss payment will not be made "until the property is actually repaired or replaced;" and "unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years." Def.'s Ex. F at 94–95.

As discussed above, it is undisputed that the Plaintiff made some repairs to the warehouse in a timely fashion; however, it is also undisputed that the Plaintiff has not replaced the roof. The Defendant argues that, given the Plaintiff's failure to replace the roof, the Plaintiff is not entitled to replacement costs under either provision. The Plaintiff argues in return that the failure to

replace the roof is not a material breach and, thus, does not relieve the Defendant of its obligations under the Policy, including replacement costs. *See* Pl.'s Resp. at 18.

As a matter of Indiana law, "[t]he Defendant can only be relieved of its coverage duties under the Policy if the Plaintiffs breached the contract, and their breach was material." *Foster v. State Farm Fire & Cas. Co.*, No. 1:10-CV-20-TLS, 2011 WL 3610425, at *12 (N.D. Ind. Aug. 17, 2011), *aff'd* 674 F.3d 663 (7th Cir. 2012); *see also New Berean Missionary Baptist Church, Inc. v. State Farm Fire & Cas. Ins. Co.*, No. 1:08-CV-1584-WTL-JMS, 2010 WL 2010464, at *5 (S.D. Ind. May 18, 2010) ("A material breach is one that goes to the heart of the contract, and whether a breach is material is generally a question of fact to be decided by the trier of fact." (quoting *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 175 (Ind. Ct. App. 2007))); *Smith v. State Lottery Comm'n of Ind.*, 812 N.E.2d 1066, 1073 (Ind. Ct. App. 2004) ("Whether a party is in material breach of contract is a question of fact . . . .").

On reply, the Defendant does not address the Plaintiff's argument that the Plaintiff's failure to replace the roof was not a material breach. Instead, the Defendant points to deposition testimony from Milton, who testified that the roof had not been replaced because the claim has not been resolved. *See* Def.'s Reply at 11–12 (citing Def.'s Suppl. Ex. P at 56:18–21). The Defendant again cites *Shifrin*, this time for the premise that "[l]ack of resolution of the claim is not legal justification for [the Plaintiff's] failure to repair or replace the roof." *Id.* (citing *Shifrin*, 991 F. Supp. 2d at 1035–36). However, in *Shifrin*, while "the crux of [the] case" was the Shifrins' failure to replace their roof, the undisputed facts showed "additional water damage [had] occurred." *Shifrin*, 991 F. Supp. 2d at 1035. In contrast, additional damage is not a fact present in the record in this case, and, unlike the Plaintiff here, the Shifrins do not appear to have argued that they had substantially complied with the relevant provisions such that their breach

was not material. Therefore, *Shifrin* is distinguishable, and the Defendant has not made any argument regarding the issue of material breach. As it is the Defendant's burden on summary judgment to show it is "entitled to judgment as a matter of law," summary judgment cannot be granted on this basis. Fed. R. Civ. P. 56(a); *see also Keller v. United States*, 58 F.3d 1194, 1198–99 (7th Cir. 1995) ("[I]t is not the responsibility of this court to make arguments for the litigants.").

6.    *Exclusion from Coverage of Normal Wear and Tear, Deterioration, and/or Faulty, Inadequate, or Defective Design, Specifications, Workmanship, Materials or Maintenance*

Next, the Defendant argues that the Policy does not cover normal wear and tear and deterioration. In response, the Plaintiff contends it is not making any claim for wear, tear, and deterioration. *See* Pl.'s Resp. at 19. The Defendant's reply argues that "[t]he faulty, inadequate or defective design and renovation of the roof in 1996 was the cause of the enforcement of a code violation necessitating replacement of the entire roof" and concludes that, "[b]ecause the roof of the building never complied with applicable code from the time it was installed in 1996, there is no O&L coverage under the Policy." Def.'s Reply at 13. Thus, it appears the parties agree that wear and tear, deterioration, and maintenance are not at issue in this suit. Instead, the Defendant's sixth argument appears to merge into its seventh.

7.    *Whether the Roof was in Compliance with the City of Portage Building Code Before the Loss*

Here, the Defendant argues that the Ordinance or Law Coverage provision excludes coverage because the warehouse was not in compliance with the City of Portage Building Code before the damage. The Policy provides that "[u]nder [the Ordinance and Law Provision] we will not pay for loss due to any ordinance or law that: (1) You were required to comply with before the loss, even if the building was undamaged; and (2) You failed to comply with." Def.'s Ex. F at

24

95. Thus, based on the plain language of the Policy, the relevant question is whether the roof complied with the code at the time of the loss in 2016, not when it was originally installed.[23]

The briefing on summary judgment does not establish whether the warehouse's roof complied with the relevant code in February 2016. The Defendant cites[24] 675 Ind. Admin. Code 13-2.2-1 (1996) and Uniform Building Code § 3208(b)(3), Table No. 32-B-1 (1991). The cited section of the Indiana Administrative Code, from 1996, adopts the 1991 UBC; and the 1991 UBC at the cited section and in the relevant table provides that asphalt shingles may not be installed on roof pitches below 2:12. However, a current version of the Indiana Administrative Code shows that provision 13-2.2 as "repealed." *See* 675 Ind. Admin. Code 13-2.2 (2021) (noting the 1993 edition was repeated by Fire Prevention and Building Safety Commission; filed Mar 31, 1998, 1:45 p.m.: 21 IR 2908). The Structurepoint Report on which the Defendant also relies similarly addresses whether the roof was code-compliant in 1996, not 2016. While Doug Sweeney's email says asphalt shingles cannot be installed, it does not say the roof as it stood violated the code. As noted above, the Defendant is obligated to establish that it is entitled to judgment as a matter of law. The Defendant has not done so here.[25]

---

[23] The Defendant cites case law for the premise that "[t]he purpose of the requirement is to require the insurer to pay for code-required upgrades required of the insured after a loss only if the building complied with the applicable code *when constructed* or renovated." Def.'s Br. at 22 (emphasis added). However, as in other sections of its brief, the Defendant cites only case law from states other than Indiana.

[24] The Defendant cites the 1996 Indiana Administrative Code for the first time in its reply, and the Defendant did not comply with Local Rule 7-1(f), which requires an attached copy of any statute or regulation not available on Westlaw or Lexis. Additionally, the Defendant does not explain the interplay between the Indiana Administrative Code and the City of Portage's code. However, the Court will address the Indiana Administrative Code as that is the law the Defendant presented.

[25] The Court notes that neither party has briefed whose burden the issue would be at trial. "Under Indiana law, an insurer relying on a policy exclusion from coverage has the burden of proof on the issue whether the exclusion applies." *Thorne v. Member Select Ins. Co.*, 899 F. Supp. 2d 820, 824 (N.D. Ind. 2012) (citing *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 725 (Ind. Ct. App. 2004)). Given that it would likely be the Defendant's burden to establish noncompliance at trial, the Plaintiff's failure to produce evidence establishing the warehouse's code compliance is not fatal at the summary judgment stage. On the other hand, the Plaintiff argues that, because the Defendant originally represented that the Ordinance and Law Coverage did apply, it is now estopped from changing its position. *See* Pl.'s Resp. at 19 (citing

25

8.      *The Plaintiff's Bad Faith Claim*

Last, the Defendant argues that the Plaintiff's bad faith claim cannot proceed to trial

because the Defendant had a reasonable basis upon which to deny coverage. In Indiana, an

insurer's obligation of good faith and fair dealing includes not only an unfounded refusal to pay

policy proceeds, but also an unfounded delay in making payment, deceiving the insured, and

exercising any unfair advantage to pressure an insured into a settlement of his claim. *See Monroe*

*Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) (citing *Erie Ins. Co. v.*

*Hickman*, 622 N.E.2d 515, 519 (Ind. 1993)).

The Defendant focuses only on its denial of the claim, citing *Thorne v. Member Select*

*Ins. Co.* for the proposition that "'[p]roof of bad faith exists when there is 'clear and convincing

evidence' which establishes the insurer had knowledge that there was no legitimate basis to deny

liability.' . . . To 'succeed on a bad faith claim at trial, a plaintiff must produce evidence

establishing that there was no reasonable basis to deny the claim.'" *See* Def.'s Br. at 24–25

(quoting *Thorne v. Member Select Ins. Co.*, 899 F. Supp. 2d 820, 826–27 (N.D. Ind. 2012)).

However, the facts in *Thorne* did not suggest the insurer had engaged in any bad faith other than

disputing the claim. Here, the Plaintiff has put forward evidence not only that the Defendant

disputed the claim but also suggesting the Defendant delayed payment on a claim it knew was

legitimate, for example by failing to provide the February 2016 underwriting report or to conduct

a timely investigation. As in *Monroe Guaranty*, "the question is whether [the insurance

company's] conduct leading up to and including the issuance of the denial letter rose to the level

---

Def.'s Ex. G-15 and G-20). As the Defendant consistently represented that it intended to investigate the
claim, a fact the Plaintiff highlights when addressing whether the Defendant relied on Tutt's
representation that the roof was code compliant, and as the Plaintiff has not moved for summary judgment
on this issue, the Court declines to find that the Ordinance and Law Coverage applies; the Court
concludes only that the Defendant has not established that the roof was not code compliant such that the
Coverage would not apply.

of bad faith." 829 N.E.2d at 977. While a bad faith finding does require "evidence of a state of mind of 'conscious wrongdoing' including 'dishonest purpose, moral obliquity, furtive design, or ill will,'" *Thorne*, 899 F. Supp. 2d at 826, the Plaintiff's evidence could reasonably be interpreted to support such a finding. Therefore, summary judgment is denied as to the bad faith claim.

## CONCLUSION

For these reasons set forth above, the Court DENIES the Defendant's Motion for Summary Judgment [ECF No. 45]. By separate order, the Court will set a telephonic status conference, at which time it will set further deadlines.

SO ORDERED on July 20, 2021.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT